IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAVID EARL COZINE                                          PLAINTIFF


        v.                          CIVIL NO. 11-5104


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                             DEFENDANT


## MEMORANDUM OPINION

Plaintiff, David Earl Cozine, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income benefits (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

## I. Procedural Background:

Plaintiff protectively filed a Title II application for a period of disability and DIB and a Title XVI application for SSI on February 8, 2008, alleging an inability to work beginning March 2, 2005, due to back problems, emphysema, high blood pressure, and problems with his feet. (Tr. 11, 209, 244-246). For DIB purposes, Plaintiff's date last insured was June 30, 2010. (Tr. 139-

-1-

141).  The plaintiff appeared with counsel and testified at a hearing held on November 18, 2009.

(Tr. 11, 35-58).  An impartial vocational expert (VE) also appeared at the hearing. (Tr. 11).

By written decision dated May 28, 2010, the ALJ found the Plaintiff met the insured status

requirements of the Act through June 30, 2010, had not engaged in substantial gainful activity

since March 2, 2005, and had an impairment or combination of impairments that were severe:

hypertension, osteoarthritis, a back disorder, a panic disorder, and emphysema. (Tr. 13).

However, after a review of the evidence, he found the Plaintiff did not have an impairment that

met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1.  After a consideration of the record, the ALJ found the Plaintiff had the

residual functional capacity (RFC) to:

> lift and carry 20 pounds occasionally and 10 pounds frequently.  The
> claimant can sit for about 6 hours during an eight-hour workday and can
> stand and walk for about 6 hours during an eight-hour work day.  The
> claimant is to avoid concentrated exposure to dusts, fumes, gases, odors,
> and poor ventilation.  The claimant can understand, remember, and carry
> out simple, routine, and repetitive tasks.  The claimant can respond
> appropriately to supervisors and usual work situations.  The claimant can
> have occasional contact with co-workers, but have no contact with the
> general public.

(Tr. 14-15).  With respect to Plaintiff's credibility, the ALJ found he was not fully credible.

However, he found that Plaintiff did retain some limitations as a result of his impairments.  With

the aid of a VE, the ALJ found the Plaintiff was capable of performing his past relevant work as

a commercial cleaner.  (Tr. 17).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

was denied on April 4, 2011.  (Tr. 1-3).  Thereafter, Plaintiff filed this action. (Doc. 1).  This

case is before the undersigned pursuant to the consent of the parties. (Doc. 5).  Both parties have

-2-

filed appeal briefs, and the case is now ready for decision. (Docs. 8, 9).

## II. Evidence Presented

Plaintiff was born in 1956, and obtained an education through the eighth grade. He did not obtain a GED or receive any vocational training. (Tr. 38-40). Plaintiff's work history consisted of occupations such as floor maintenance, woodworker, and punch operator. (Tr. 160).

Medical records beginning in February 2004, prior to Plaintiff's alleged onset date of March 2, 2005, showed treatment for dizziness and hypertension. Plaintiff was prescribed Micardis for high blood pressure daily. (Tr. 234-236, 237-239, 241-243). On February 17, 2005, Plaintiff went to Mediserve Walk-In Clinic (Mediserve), claiming he had three episodes of near-syncope. There were "no signs of activity or incontinence." He was instructed to continue the Micardis, and scheduled an RTC lab testing. His diagnosis was hypertension. (Tr. 237-239). Subsequently, on February 26, 2005, Plaintiff went to Mediserve for a refill on his Micardis. He had missed two days of work due to not taking his blood pressure medication. He alleged he was no longer having weak spells, but he was still smoking cigarettes. An RTC lab was again scheduled, along with an EKG. Plaintiff was informed if he failed to show this time, he would not get another refill on his Micardis. (Tr. 234-236). On February 27, 2005, Plaintiff underwent RTC testing and an EKG at Mediserve. (Tr. 221).

The evidence during the relevant time period reflects the following. On the alleged onset date, March 2, 2005, Plaintiff returned to Mediserve, received a refill on Micardis, and was instructed to take ASA (Aspirin) and Ibuprofen daily. (Tr. 219-220). Subsequently, on March 5, 2005, Mediserve took x-rays of the Plaintiff's chest, due to allegations of difficulty breathing, blurred vision, and dizziness when standing, which began after the March 2nd visit. The x-rays

-3-

showed chest hyperinflation.  Plaintiff was prescribed Micardis, and over- the- counter Aspirin, and instructed to be on light duty at work.  Plaintiff was diagnosed with Chronic Obstructive Pulmonary Disease (COPD).  (Tr. 216-217).  Plaintiff returned to Mediserve on March 10, 2005, and was diagnosed with hypertension and COPD.  He was prescribed more Micardis, and instructed to return to light duty for a week at work and then regular duty.  (Tr. 210-212).  A Social Security disability report revealed that Plaintiff received Albuterol for breathing, Aspirin for his heart, and high blood pressure medication, prescribed by Mediserve.  He also underwent an EKG and blood work at Mercy Rogers Medical Center in 2005.  (Tr. 147).

On March 8, 2008, Plaintiff completed a Social Security Pain Questionnaire.  (Tr. 150). Plaintiff reported that he did not suffer from unusual fatigue, but required a nap for a few hours every day.  He alleged his pain was in his mid to lower back and was constant, dull, and aching, unless his back went out, which made it unbearable.  He reported the pain was always there and interfered with his sleep.  He stated he could stand/walk and sit for a couple of minutes before the pain would occur.  (Tr. 150).  Plaintiff further reported that other than his medication, a joint, alcohol, and "icy hot" helped the pain.  He admitted he was not taking his medication at that time because he did not like taking pills.  However, he stated a side effect of marijuana was paranoia and he had not needed to discontinue any medication because of side effects.  He further reported he had never been prescribed a special treatment that did not work.  (Tr. 151).

On April 18, 2008, Plaintiff underwent a General Physical Examination conducted by Dr. Randy Duane Conover.  Plaintiff stated his main difficulty with working was back pain.  Plaintiff admitted to smoking a pack of cigarettes a day.  (Tr. 248).  Dr. Conover observed Plaintiff's range of motion was normal for all extremities and Plaintiff's cervical spine, and Plaintiff's

-4-

lumbar spine had a range of motion of eighty degrees on a scale of zero to ninety.  (Tr. 250).

Plaintiff's grip in both hands was 95%. (Tr. 251). Lab results revealed a mild increased

subchondral sclerosis, and mild decreased joint space. Plaintiff was diagnosed with osteoarthritis,

hypertension, and emphysema with clubbing, and Plaintiff was found to be able to handle, finger,

see, hear, and speak.  (Tr. 252).  Dr. Conover found that Plaintiff had moderate limitation with

walking; mild limitations with standing, sitting, and lifting; and a severe limitation with carrying.

(Tr. 252).

On September 15, 2008, Plaintiff completed an appeals disability report. (Tr. 171-177).

He alleged he had increased dizziness, difficulty breathing, and fatigue due to emphysema**,**

beginning July, 2008.  Plaintiff stated he had difficulty breathing even when sitting or lying

down.  He further alleged severe back pain, which caused  him to become bedridden for days.

Plaintiff also stated he had begun experiencing severe panic attacks due to his worsening

physical conditions and his fear of dying.   However, Plaintiff had not seen a

doctor/hospital/clinic for any of his conditions limiting his ability to work since his last disability

report. (Tr. 172).   He stated he had no insurance and could not afford to go to a doctor.  (Tr.

176).  He had not worked since his last completed disability report. (Tr. 174).

On November 14, 2008, Plaintiff underwent pre- and post-bronchodilator studies

conducted by Dr. Jon A. Sexton at Medical Associates of Northwest Arkansas. (Tr. 259).  The

pre-bronchodilator studies showed a normal Forced Vital Capacity (FVC) and Forced Expiratory

Volume in one second (FEV1),  with a borderline reduction in  FEV1/FVC.  The peak flows

were normal, while the mid flows were mildly reduced.  The post-bronchodilator studies showed

moderate improvement in mid flows.  The impression was mild airflow obstruction in the

smaller airways with moderate bronchodilator  response suggesting reactive airways process. (Tr. 262).

On December 2, 2008, Plaintiff went to Northwest Arkansas Free Health Center for back pain,  trouble breathing, heaviness in his chest, shortness of breath, and pain when breathing. (Tr. 303).  At that time, Plaintiff's medication consisted of Albuterol.  He still smoked half a pack of cigarettes a day, and drank once or twice a week. (Tr. 303).  Plaintiff was diagnosed with chronic high blood pressure and "history of emphysema and MI[1]." (Tr. 303)

Plaintiff went to Washington Regional Medical Center on December 8, 2008, for chest x-rays, lumbosacral spine x-rays,  and lab work. (Tr. 304-208).  The reason for the exam was hypertension, degenerative disc disease, and shortness of breath.  The findings revealed the cardiomediastinal silhouette was normal in contour and size, the lungs were clear, and no pleural fluid collection or pneumothorax was seen.  The impression was that there was no acute disease. (Tr. 304-307).  The lumbosacral spine x-rays revealed the vertebral bodies of the lumbar spine maintained normal height and alignment, and the disc spaces appeared normal.  The impression was no compression fractures and minimal endplate remodeling at L2-L3 with preserved disc height.  (Tr. 308).

On December 9, 2008, Plaintiff returned to Northwest Arkansas Free Health Center, due to back pain and trouble breathing. (Tr. 302).  He was still smoking three-fourths of a pack of cigarettes a day and drinking socially.  At that time, he reported taking Aspirin and Diclofenac for pain. (Tr. 193).  He alleged the Diclofenac was causing burning in his stomach and helping his knee, but not his back.  His lungs appeared clear.  He was given back exercises to help with

---

[1] The Court believes "MI" refers to Myocardial Infarction.

the arthritis and degenerative disc disease.  The physician's notes stated he wanted to continue taking the Diclofenac despite the side effects, and he was instructed to return in a couple of months.  (Tr. 302).

A Physical RFC Assessment was completed by Dr. Jim Takach, a non-examining medical consultant, on December 10, 2008.  (Tr. 268).  The assessment revealed that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour work day; sit (with normal breaks) for a total of about six hours in an eight-hour work day; and push and/or pull (including operation of hand and/or foot controls) for an unlimited amount of time, other than that which is shown for his ability to lift and carry.  Dr. Takach indicated that Plaintiff showed the ability to function with light work limits, and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 269, 272).

On January 14, 2009, Plaintiff underwent a mental status and evaluation of adaptive functioning examination by Dr. Gene Chambers, of Mindworks.  (Tr. 278-282).  Plaintiff reported he got nervous around a lot of people, which would generally trigger a panic attack.  He described a number of people as four.  He also stated if he was around a stranger and was  not anticipating the encounter, it would trigger a panic attack.  He reported he had been having panic attacks for at least ten years.  Plaintiff could not recall where his first panic attack occurred, but recalled having the experience that being there was strange and feeling the overwhelming need to get out.  Since that point in time, he had numerous panic attacks and adapted by avoiding situations that would trigger them.  He stated he would have them at home, but they were much more infrequent, and they usually occurred when he was alone.  Due to his physical symptoms,

-7-

he feared he would die without anyone there to help him.  These attacks had occurred in the past when he was grocery shopping or at church.  The majority of them occurred when out and away from home.  Plaintiff further stated he was depressed a lot, and would get very nervous or become despondent over insignificant things.  (Tr. 278).

Plaintiff did not have a history of psychiatric treatment.  At that time, Plaintiff reported he was not taking any medication due to cost.  Plaintiff revealed he lived with his daughter and had been arrested for possession, public intoxication, and DUI's.  He offered his employment history of framing houses, building boats, factory work, and working at Wal-Mart.  He stated he last worked at Wal-Mart in 2004, but quit when he started having dizzy spells and, ultimately, a heart attack.  Plaintiff admitted to smoking three-fourths of a  pack of cigarettes a day, having started smoking at age fifteen.  He estimated averaging seven to eight beers a month, but revealed he used to drink heavily on a daily basis for about three years.  He stopped drinking regularly when he had his heart attack in 2004.  Plaintiff also reported he started smoking marijuana at the age of fifteen, and smoked heavily until he was in his twenties. He then quit for fifteen years.  However, he acknowledged he still smoked when he had problems sleeping, which, at the time, was about five to ten times per month.

Dr. Chambers noted Plaintiff's thought processes were logical and relevant (Tr. 280).  Dr. Chambers diagnosed Plaintiff with the following:

> Axis I: dysthymia, panic disorder with agoraphobia, alcohol dependence
> (complete sustained remission), and cannabis abuse;
> Axis II: antisocial personality traits;
> Axis III: deferred;
> Axis IV: occupational problems and problems related to the social environment;
> Axis V: GAF: 50-60.

(Tr. 280).

Regarding Plaintiff's adaptive functioning, Dr. Chambers noted that Plaintiff reported no difficulties. Although he relied on someone for transportation, he offered that he could find places unfamiliar to him on his own. Plaintiff managed money himself when he had it. He socialized with immediate family only, and was limited with household chores due to his back pain. Dr. Chambers found that Plaintiff's ability to communicate and interact in a socially adequate manner was within normal limits, and his capacity to communicate in an intelligent and effective way was within reasonable limits. Dr. Chambers noted Plaintiff was cooperative, provided a motivated effort, and appeared capable of managing funds without assistance. (Tr. 282). Dr. Chambers also found that Plaintiff's capacity to cope with typical demands of basic work and to attend and sustain concentration on basic tasks had limitations, due to his panic disorder. (Tr. 281). Plaintiff reported to Dr. Chambers that his ability to work if he had no physical difficulties depended on whether he could tolerate being around people. Plaintiff indicated he had gotten increasingly uncomfortable and nervous around numbers of people. (Tr. 282).

On January 20, 2009, Dr. Jerry Henderson, a non-examining medical consultant, completed a Psychiatric Review Technique form indicating Plaintiff had mild restrictions of his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 293). Dr. Henderson's notes indicated the following:

> 51-year-old claimant primarily alleging physical impairments but noting panic attacks. There appear to be some significant discrepancies in the claimant's account of a history of anxiety and panic problems. In a 1/09

> mental status exam, the claimant notes a ten year history of significant
> anxiety with panic attacks and agoraphobia. The MSCE resulted in a
> diagnosis of panic disorder with agoraphobia, dysthymia and cannabis
> abuse. In contrast to the claimant's report of symptoms in the MSCE
> EEE,... his ADL form... indicates social activity, with attending church
> weekly and there is no mention of significant anxiety limiting his
> functioning. There was no mention or observation of anxiety in a 4/08
> GPCE. The claimant has no history of psychiatric treatment and takes no
> psychotropic medications. Overall findings would appear consistent with
> unskilled capacity in an environment in which interpersonal contact was
> only incidental.

(Tr. 295).

On the same date, Dr. Henderson completed a Mental RFC Assessment, stating Plaintiff had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal work-day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work place. Dr. Henderson noted the Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete." (Tr. 299).

On February 2, 2009, Plaintiff was admitted into Washington Regional Medical Center for chest pain and shortness of breath. (Tr. 311-323). Plaintiff stated he was doing laundry and

-10-

became short of breath.  He stated he also felt pain in his left arm after his blood pressure was

taken. (Tr. 314).  At that time, his medications included Amitriptyline Hydrochloride, a muscle

relaxer, and Aspirin.  His pain was most severe in the sub-sternal area.  The notes from the

treating physician stated as follows:

> 52-year-old who had a five second episode of chest pain and shortness of
> breath while doing laundry at his daughter's house.  He tells me that he
> was seen at Mediserve one time and they prescribed blood pressure
> medicine for him (he is not taking it now because he cannot afford it) and
> they told them that he had a heart attack some time in the past.  He says
> that he never knew that he had a heart attack.  However, his EKG today
> is completely normal, and 5 of 7 BP here... are normal, the other two are
> only mildly elevated.  He says that he had vomiting and diarrhea
> yesterday and the day before.  I see no evidence that this is cardiac and
> with it only lasting 5 seconds, it does not sound cardiac.  This is more
> likely esophagitis associated with vomiting that he had.

(Tr. 315).

Plaintiff reported smoking one pack of tobacco per day, and had been for forty years.

Plaintiff also reported consuming alcohol socially,  and had a history of cannabis abuse.  (Tr.

315).  An x-ray was taken of Plaintiff's chest which found the heart was normal size, no

mediastinal widening or pneumothorax was present, and there was no evidence of infiltrate,

consolidation, or pleural effusion.  (Tr. 321).  There was no free air under the diaphragm.  The

impression was that there was no acute airspace disease.  (Tr. 321).  Plaintiff was discharged on

atypical chest pain, unknown cause.  There was no recorded prescription.  (Tr. 319).

On February 23, 2009, Plaintiff completed another appeals disability report, wherein he

noted  his emphysema was not showing up and possibly could have been gone, and that he had

a hard time being around people and had to talk himself into leaving his house. (Tr. 187).   He

reported the date these changes occurred was November, 2008.  Plaintiff stated he had anxiety

-11-

around people,  and was depressed because of his living conditions.  He dreaded getting up in the morning, and had a hard time going to sleep because he was afraid he would die in his sleep. (Tr. 187).  He was constantly anxious about getting things done immediately, but he had not seen a doctor/hospital/clinic for the emotional or mental problems limiting his ability to work. (Tr. 187).

Plaintiff's medications included Amitriptyline to help him sleep, Cyclobenzaprine and Diclofenac for pain, and Proventil for his emphysema prescribed by Dr. Patricia Scott, at the Free Health Center. (Tr. 189).  Plaintiff reported the Amitriptyline made him feel like he was going to pass out, the Cyclobenzaprine made him feel hung-over, the Diclofenac caused a burning sensation in his stomach, and the Proventil had no side effects.  (Tr. 189).  Plaintiff further reported he had to bathe using one hand because of his hurt left shoulder, and that it took a long time to get dressed, along with anything else that required him to raise his left arm.  (Tr. 190). The only daily activity he had was a little cleaning around the house.  (Tr. 190).  Plaintiff remarked he was losing his memory and was always nervous.  He reported he was not taking most of his medications because of the side effects.  (Tr. 191).

**III.  Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the

-12-

Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § § 423 (d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. § § 404.1520, 416.920.  Only

-13-

if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § § 404.1520, 416.920.

## IV.  Discussion:

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled. Defendant argues substantial evidence supports the ALJ's determination.

### A.  Subjective Complaints and Credibility Analysis:

We first address the ALJ's assessment of Plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Although Plaintiff contends that his impairments were disabling, the evidence of record does not support this conclusion.

With regard to Plaintiff's alleged  mental impairments, the record establishes Plaintiff

-14-

has not sought any medical treatment for his alleged disabling mental impairments.  See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001)(holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability); Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999)(holding that plaintiff's failure to seek consistent medical treatment weighed against his subjective complaints).  At the hearing held November 18, 2009, the ALJ inquired if the Plaintiff had sought any type of mental health treatment in the past five years, or if the Plaintiff was taking any type of anti-depressant or other medication to help his alleged mental impairments.  The Plaintiff responded to both in the negative.  (Tr. 51).  Nor did Plaintiff list any mental impairments when reporting the conditions he believed limited his ability to work.  (Tr. 143, 209). Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)( "An ALJ is not obliged 'to investigate a claim not presented at the time of the application for benefits...'")(quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)).

It is also noteworthy that Plaintiff indicated he was smoking marijuana in March, 2008 as a form of self-medicating, and noted a side effect of such use was paranoia.  (Tr. 150-151).  Plaintiff also stated in a Function Report dated March 8, 2008, that he liked to spend time with others, talking and visiting, as much as he could.  (Tr. 156).  He reported he went to church on a regular basis, and did not have any problems getting along with family, friends, neighbors, or others.  At that time, he stated he had not noticed any unusual behavior or fears. (Tr. 156-158).  Thereafter, Plaintiff alleged severe panic attacks due to his fear of dying beginning in July 2008.  (Tr. 172).  However, during a mental diagnostic evaluation in January of 2009, Plaintiff reported he had been having these attacks for ten years, and that he had been avoiding situations which would trigger them since that point in time. Plaintiff reported he got nervous around a lot of

-15-

people.  He stated these events had happened in the past while grocery shopping or at church,

the majority of the attacks taking place away from home.  (Tr. 278).  Therefore, Plaintiff's

reports regarding when these panic attacks and fears began were inconsistent, and support the

ALJ's finding that the Plaintiff's subjective complaints were not fully credible.  See Gray v.

Apfel, 192 F.3d 799, 804 (8th Cir. 1999)(noting inconsistent statements cast doubt upon

credibility.).  After reviewing the record as a whole, the Court finds substantial evidence to

support the ALJ's determination that Plaintiff's mental impairments were not disabling.

Furthermore, while Plaintiff alleged an inability to seek treatment for his mental

impairments due to lack of finances, the record did not contain any indication Plaintiff had

attempted to seek treatment from a free clinic for mental impairments or had been denied

treatment due to his lack of finances.  Murphy v. Sullivan, 953 F.3d 383, 386-87 (8th Cir.

1992)(holding that lack of evidence that plaintiff sought low-cost medical treatment from her

doctor, clinics, or hospitals does not support Plaintiff's contention of financial hardship).  The

record showed that Plaintiff had sought treatment at a Free Health Clinic in 2008 for his

emphysema and back pain, and had received medications for them.  However, he had never

alleged any mental impairments.  Furthermore, the record indicated Plaintiff had the funds to

drink socially, smoke marijuana, and smoke cigarettes regularly.

With regard to Plaintiff's alleged back problems, problems with his feet, and high blood

pressure, the record showed Plaintiff failed to consistently take his prescribed medications.

Plaintiff reported in 2008 that he was not taking any medications for his pain because he did not

like pills.  However, he admitted he had never been prescribed a medication that did not work.

Brown v. Barnhart, 390 F.3d 535, 540-541 (8th Cir. 2004)(citations omitted)("Failure to follow

-16-

a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."); 20 C.F.R. § 416.930(b).

Subsequently, in 2009, Plaintiff again stated he was not taking his prescribed Diclofenac for his pain, but was taking Aspirin instead. See Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987)(disabling pain not indicated when claimant merely took hot showers and used Advil and Aspirin to relieve pain); Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994)(lack of strong pain medication was inconsistent with disabling pain.); Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999)(infrequent use of prescription drugs supports discrediting complaints.) Plaintiff also stated in February of that same year that he did not take most of his medications because of the side effects. However, the record showed Plaintiff only reported a side effect from Diclofenac to his treating physician once, but stated he wanted to continue taking it. (Tr. 302). See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)(noting that Plaintiff has the burden of proving the side effects of medication are significant enough to prevent him from working); Van Vickle v. Astrue, 539 F.3d. 825, 830 (8th Cir. 2008)(side effects are not significant enough to prevent working when Plaintiff voluntarily continues taking medication).

With regards to Plaintiff's high blood pressure, he reported to his treating physician at Washington Regional Medical Center in 2009 that he was not taking the blood pressure medicine prescribed to him by Mediserve because he could not afford it. However, it is again noted that Plaintiff had the funds to support his smoking habit and to drink socially. Furthermore, Plaintiff testified at the hearing before the ALJ later that year that his blood pressure seemed to be under

-17-

control, and was not a problem at that point. (Tr. 48).  See Brown, 390 F.3d at 540. ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.")

With regards to Plaintiff's allegations of emphysema, the record contained numerous accounts where the Plaintiff admitted to smoking up to a pack of cigarettes a day.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008)(noting that "continued smoking amounts to a failure to follow a prescribed course of remedial treatment"when smoking has a direct impact on the alleged disability).  Plaintiff testified at the administrative hearing that his emphysema was getting better because he had cut back to smoking half a pack of cigarettes a day.  He admitted he was not using anything to help him quit smoking.  However, in February of 2009, Plaintiff reported to his treating physician at Washington Regional Medical Center that he was told his emphysema was gone.  Subsequently, it was noted in a disability report that his emphysema was not showing up.

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities.  In a Function Report dated March 8, 2008, Plaintiff reported he could take care of his personal needs and grooming; prepare simple meals; clean the house; do the dishes; shop for groceries;  walk  and  drive  locally;  pay bills,  handle  a  savings  account,  and  use  a checkbook/money orders; and watch television daily.  (Tr. 152-159).  Plaintiff further reported he would finish what he started, and could follow written and spoken instructions.  While he mentioned he did not like authority, he reported he had never been fired due to problems getting along with others.  Plaintiff reported he liked to spend time with others and did not have any problems getting along with family, friends, neighbors or others.  He also reported he went to church on a regular basis.  This level of activity belies Plaintiff's complaints and the Eighth

-18-

Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain.  See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999)(holding ALJ's rejection of claimant's application was supported by substantial evidence where daily activities- making breakfast, washing dishes and clothes, visiting friends, watching television and driving- were inconsistent with a claim of total disability).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)(holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability.)  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**B. RFC Assessment:**

We next turn to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required

-19-

to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of Plaintiff's treating physicians, examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined that Plaintiff could perform light work with limitations. The Court notes that the ALJ found that Plaintiff had the RFC to perform light work, except that he must avoid concentrated exposure to dusts, fumes, gases, odors, and poor ventilation. Furthermore, the Plaintiff could have occasional contact with co-workers, but could have no contact with the general public.

In deciding not to give controlling weight to Dr. Conover's opinion that Plaintiff had a severe carry limitation, the ALJ noted this finding was not consistent with the record as a whole. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)(the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.) The ALJ noted objective medical tests, including x-rays, did not show the level of impairment alleged by the Plaintiff. Specifically, the ALJ noted x-rays of the lumbar spine region only revealed the Plaintiff had "minimal endplate remodeling at L2-3 with preserved disc height" (Exhibit B13F). (Tr. 16). Furthermore, Dr. Conover's exam notes contradicted his claim that the Plaintiff had a severe carry limitation. Dr. Conover found that Plaintiff's lumbar spine contained the only abnormal range of motion, which was eighty degrees on a scale of zero to ninety. All extremities and Plaintiff's cervical spine were within the normal range of motion. Furthermore, Dr. Conover noted Plaintiff's left and right grip were at ninety-five percent. See Holmstrom v. Massanari, 279 F.3d 715, 721 (8th Cir. 2001) (noting ALJ properly discounted the

opinion of an RFC evaluation when the opinion was inconsistent with the physician's own notes in the medical record).

The ALJ also considered the opinion of Dr. Chambers, who conducted a mental diagnostic evaluation, and concluded that Plaintiff had limitations based on his panic disorder in his capacity to complete tasks which would involve him being around numbers of people.  The ALJ noted that although the evidence of the record in regard to Plaintiff's panic disorder was somewhat contradictory, the Plaintiff nonetheless had some limitations, which was reflected in the Plaintiff's RFC.  Furthermore, Dr. Chambers reported that Plaintiff maintained a GAF score of 50-60, which has been associated with a moderate impairment in occupational functioning. Martise v. Astrue, 641 F.3d 909, 919 (8th Cir. 2011)(according to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates moderate symptoms)(citations omitted).

The ALJ also addressed the opinion of Dr. Jon A. Sexton, who conducted the pulmonary function report for a disability determination and determined Plaintiff would suffer limitations as a result of his emphysema.  Although the record subsequently indicated the emphysema could be gone, the limitations were reflected in the Plaintiff's RFC.   The ALJ further addressed Plaintiff's limitations with regard to his high blood pressure, although the record indicated he only seemed to have problems with this when he has failed to take his medication.

Based on the foregoing, the Court finds substantial evidence of record to support the ALJ's RFC determination.

### C. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of

record, the undersigned  finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the VE's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments do not preclude him from performing work as a commercial cleaner. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence.)

**V. Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 4th day of June, 2012.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-22-